SUMMIT DEFENSE
A Professional Law Corporation
JAMES T. REILLY, Attorney at Law
California State Bar No. 67254
102 Washington Avenue
Point Richmond CA 94801

Phone:  510-412-8900
Cell:   415-913-0787

Attorneys for Defendant ROBERTO HECKSCHER

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | : Case No. CR 09-0998SI |
| | : |
| Plaintiff, | : |
| | : DEFENDANT'S SENTENCING |
| vs. | :      MEMORANDUM |
| | :   (Crim L.R. 32-5(b)) |
| ROBERTO HECKSCHER, | : |
| | : |
| Defendant. | : |

## I

### ROBERTO HECKSCHER

On June 8, 2009, racked by despair, guilt, shame and -- more than anything else -- humiliation, Roberto Heckscher swallowed 90 Ambien (Zolpidem Tartrate) sleeping pills and laid down on his bed to die.  For the previous 30 days or more, his increasing feelings of regret, despondency and hopelessness had gradually overwhelmed his judgment until, seen through a glass, darkly, his life no longer appeared to have worth or meaning.

On that day, Mr. Heckscher genuinely believed that ending his life was the only logical and reasonable course of action left to him.  He wrote a note explaining why and concluding, "For everyone whose life I have touched, I pray that you will be able to come to grips with the betrayal I have imposed on you.  You did not deserve it.  I am so, so, very sorry ....." (A copy of the complete suicide note is attached hereto as Exhibit A.)

As he later came to realize, this attempt was in fact irrational, cowardly and selfish.  Fortunately, Mr. Heckscher had shared the cause of his despair the previous night with his wife Cynthia and had showed her his suicide note.  Stunned by what her husband had told her, Mrs. Heckscher had spent a restless night and, by the next day, had decided that she should notify law enforcement.

When she did so, officers of the San Mateo Police Department went to their home and found Mr. Heckscher comatose.  He was taken to the hospital, treated and then held for a psychiatric evaluation pursuant to California Welfare & Institutions Code section 5150.

What had brought the Heckschers to this mutual nightmare had been building for approximately 30 years and is, of course, the underlying basis of the prosecution in this case.  The genesis of the problem which ultimately led to Mr. Heckscher's appearance before this court was, by way of almost bizarre coincidence, the largest individual financial collapse to that point in history.

In the 1970's, two sons of Texas oil billionaire H. L. Hunt, Nelson "Bunker" Hunt and William "Herbert" Hunt, tried to corner the world silver market and very nearly succeeded.  They managed to run up the price of silver from $1.50 an ounce in 1970 to nearly $50 an ounce in 1980, by which time the Hunts owned $4.5 billion worth of

silver bullion.  At that time, they also held futures contracts, at more than $50 per ounce, for another $135 million worth of the precious metal.

Then COMEX suspended trading of silver and the Federal Reserve raised interest rates.  On March 25, 1980, the price of silver plummeted to $21.62 and the Hunts could not meet a $100 million margin call.  The next day, the so-called "Silver Thursday", the metal dropped again to $10.80 and the Hunts found themselves more than $1 billion in debt, a level never before then achieved by any non-governmental individual or organization.

The margin call which brought down the Hunt brothers also caught Mr. Heckscher short, as he had joined in the purchase of silver futures during the price run up.  Fortuitously (or not, as things turned out), an early client of Mr. Heckscher's accounting business happened at that very time to be looking for an investment opportunity.  Mr. Heckscher borrowed the money to cover his margin call and thus began the long downward spiral that culminated in his suicide attempt and this prosecution.

When repaying the initial investment exceeded Mr. Heckscher's disposable income, he compounded the problem by borrowing more money, as ostensible "investments", to cover what he had to repay.  As time went on, in the classic manner of such programs, the amount he owed continued to grow, as did the amount of money that he had to obtain from new "investors" to make the payments and keep the program going.

/////

/////

/////

## II

## A MODEST LIFE

The reported multi-million dollar loss in this case is typical of Ponzi schemes.  Nevertheless, Mr. Heckscher's situation is extraordinarily atypical for two primary reasons:

First, the perpetrators of such schemes usually use the proceeds of their fraud for self-aggrandizement, converting vast sums of money to their personal use.  They typically buy expensive homes, luxury cars, jewelry, art and other collectibles, vacation homes and even private planes and yachts.

Mr. Heckscher, on the other hand, never used any of the money he obtained in this scheme for personal purchases.  He and his wife lived a modest lifestyle, residing in a typical middle-class home in San Mateo and continuing, in his case, to work six days a week at his accounting and tax preparation business.  They drove modest cars, rarely travelled or took vacations, and made no expensive purchases.

To the extent that new investment money was not used to pay interest or repay principle to previous investors, it was used solely in efforts, however misguided, to recoup losses and dig himself out of the hole Mr. Heckscher had created for himself.  Some stock investments and even his gambling activities were desperate attempts to extricate himself from his financial morass.

Second, while operators of Ponzi schemes usually take a lot of money out of their "investment" programs, they never put anything in.

Mr. Heckscher was, again, atypical, in that he often used money earned from his primary business (accounting and tax preparation) to pay interest or repay principle owed to his investors.

These unusual characteristics of Mr. Heckscher's Ponzi scheme are the primary reasons that he was able to keep the program not only going, but a complete secret from everyone else, for nearly 30 years. No other known scheme of this nature has ever been maintained for such a long period of time, not even that of the infamous Bernard Madoff.  Most such schemes collapse under their own weight within a relatively short time, usually not more than a few years, because the operators are draining the money off for their lavish lifestyles.

### III

### SELF-SURRENDER AND COOPERATION

Before he was even released from the hospital in June 2009, Mr. Heckscher retained Summit Defense to represent him in this case for the purpose of turning himself in and providing complete information to law enforcement about his fraudulent activities.

After his release from the hospital, he met with counsel on Monday, June 15, 2009, to discuss details of the situation and how to accomplish his surrender.  During that week, counsel began discussions with both the San Francisco Police Department fraud unit and the US Attorney's Office regarding Mr. Heckscher and his possible surrender and cooperation with authorities.

On Monday, June 22, 2009, Assistant US Attorney Adam Reeves confirmed that he and agents of the FBI would meet with Mr. Heckscher to discuss the matter.  The meeting took place at 10:30 am on Tuesday, June 23, 2009, with Mr. Reeves and FBI Special Agents John Broderick and Jeremy Desor.

At this initial meeting, Mr. Heckscher gave a complete and thorough statement regarding his Ponzi scheme, and provided all of his records regarding investments, interest payments and repayments of principal to investors.  He also agreed to provide bank records and any other information requested by the FBI.

Mr. Heckscher had been prepared to be arrested and taken into custody at his initial meeting with the FBI, but this did not occur.

On Friday, June 26, 2009, Special Agent Desor visited Mr. Heckscher's office to pick up the bank records and other documents pertinent to the investigation.

Subsequently, the charge in this case was filed, a plea agreement was reached and Mr. Heckscher was arraigned and entered a conditional plea of guilty on October 30, 2009.

He has at all times since coming forward been completely forthright regarding his activities and has cooperated fully with the FBI and the US Attorney's Office.

By entering a plea of guilty, Mr. Heckscher has saved the government the cost of preparing for and conducting a trial of this matter.  His plea of guilty also obviates any need for the victims to have to testify, thereby alleviating, in however small a degree, their emotional distress in this regard.


**IV**

**A PONZI SCHEME SURVEY**


Considering the inevitability of collapse and the penal consequences attendant thereto, there have been a surprisingly large

number of Ponzi scheme convictions in recent years.  A survey of some similar federal court ponzi scheme cases is instructive, both in terms of monetary loss and sentencing considerations.

| Defendant's Name: | Location: | Approximate Loss: | Sentence: |
|---|---|---|---|
| Bernard Madoff | New York | $18 Billion | 150 Years |

       While executing the most extensive Ponzi scheme ever, Mr. Madoff lived a lavish lifestyle, diverting millions of dollars to his personal use over a 20 year period.

| | | | |
|---|---|---|---|
| Richard Harkless | California | $39 Million | 100 Years |

       This scheme lasted just 4 years and Mr. Harkless diverted millions of dollars to personal accounts in Belize and Mexico.  He fled to Mexico for five years before being captured and convicted at trial.

| | | | |
|---|---|---|---|
| Tom Petters | Minnesota | $3.65 Billion | 50 Years |

       Second only to Bernard Madoff in total loss, this scheme by Mr. Petters used millions of dollars to fund his business interests and to maintain a lavish, extravagant life style, including an expensive home and vehicles, as well as extensive travel.

| | | | |
|---|---|---|---|
| James Bunchan | Massachusetts | $30 Million | 35 Years |

       In addition to defrauding 400 victims, Mr. Bunchan solicited the murder of 12 witnesses against him and

discussed the killing of the federal prosecutor handling
his case.  He was sentenced to 25 years for the
solicitation to kill the witnesses.

Scott Rothstein      Florida           $1.2 Billion        Pending
A lawyer, Mr. Rothstein is attempting to reduce a possible
100 year sentence by cooperating with authorities.  The
US Attorney has agreed not to seek a life sentence and
a prison sentence in the 20-35 year range seems likely.
Money was diverted for several homes, 16 luxury vehicles
and sports cars, hundreds of pieces of jewelry and 20
bank accounts (one in Switzerland).  He also made millions
of dollars in political campaign contributions.

Gerald Payne        Florida           $448 Million        27 Years
Minister swindle of church members, with hundreds of
millions of dollars "disappeared" and unaccounted for.
Thought to be connected to a militant, right-wing group
that planned to buy a Caribbean Island.  His wife Betty
was sentenced to 13 years after the Paynes and two
associates were convicted at trial.

Benny Judah         Texas             $60 Million         25 Years
In just four years, Mr. Judah defrauded 250 investors out
of nearly $60 million, violated a specific judicial
injunction, violated securities laws, and obstructed and
impeded the administration of justice.

Randall Treadwell   California      $50 Million           25 Years
                    Among other things, Mr. Treadwell used the proceeds of
                    his scheme to purchase an expensive home in Georgia, a
                    Jacksonville Jaguars luxury box, a $100,000 boat and a
                    Caribbean cruise.  A companion who made false statements
                    to investigators was sentenced to 7 years.

Milton Retana       California      $62 Million           25 Years
                    Mr. Retana defrauded approximately 2300 primarily Spanish-
                    speaking victims and was convicted at trial of six counts
                    of wire fraud.  Actual losses after payments of interest
                    were about $33 million.  When arrested, Mr. Retana had
                    $800,000 in cash in his desk, $3.2 million hidden in the
                    back of his bookstore and $8 million in bank accounts.

Norman Hsu     New York        $100 Million        24 Years, 4 Months
                    Mr. Hsu swindled victims out of $100 million, with an
                    actual loss of $80 million, and used most of the money to
                    finance a lavish lifestyle.  He was also convicted at trial
                    of campaign finance fraud and sentenced to 52 months to
                    run consecutively to a 20 year Ponzi scheme sentence.

Wayne Puff          New Jersey      $120 Million          18 Years
                    In a 7 year scheme, Puff and associates obtained more than
                    $120 million from victims, with actual losses of $101
                    million ordered as restitution.  Puff diverted millions to
                    pay personal expenses, including travel expenses to the
                    Cayman Islands.

Andres L. Pimstein    Florida        $25 Million        17 Years

      Mr. Pimstein used investor money to fund his business
interests and diverted significant amounts to pay his
personal expenses.  A significant portion of the missing
money has not yet been accounted for.

Michael Heshelman    Michigan       $7 Million         17 Years

      Mr. Heshelman was convicted at trial on multiple counts of
bank and wire fraud.  He used the "investments" to pay for
personal and unrelated business expenses, including
$25,000 hotel bills, international travel and extravagant
dinners.  He was arrested while travelling outside the
United States in Switzerland.

Sean N. Healy    Pennsylvania       $16.7 Million    15 Years 8 Months

      Mr. Healy spent $10 million in just one year on a lavish
lifestyle.  His purchases included former football star
Bernie Kosar's $2.4 million mansion (on which he made
another $2 million in renovations), four Lamborghinis,
three Porsches, two Ferraris and 8 other sports cars, as
well as $1.5 million in jewelry.

Joseph Forte    Pennsylvania        $80 Million        15 Years

      In a scheme that lasted 13 years, Mr. Forte took in $80
million and swindled investors out of at least $35 million,
of which he diverted between $12 and $28 million to his
personal use.

Neola Midkiff        Minnesota       $30 Million        15 Years

       Convicted at trial of eight counts each of mail and wire
       fraud, as well as other offenses, the 15 year sentence
       was a downward departure from the maximum possible life
       sentence faced by Mr. Midkiff.

John Anthony Miller   California      $21 Million        13 Years

       With his scheme unraveling, Mr. Miller solicited an under-
       cover informant to assist him in obtaining a fake passport
       to a country that did not extradite to the US.

Wesley A. Snyder     Pennsylvania    $29 Million    12 Years, 2 Months

       Mr. Snyder operated a mortgage company Ponzi scheme in
       which most of the money went to pay interest and repay
       principal to earlier investors.

Kalin Dao            Minnesota       $7 Million         12 Years

       Miss Dao defrauded 517 people, many of whom are immigrants.
       She continued doing so, by changing the name of her firm,
       after accepting a consent decree to stop selling
       unregistered securities.

Darrell Underwood    Virginia        $18 Million        10 Years

       When arrested, Mr. Underwood and his wife had $890,000 in
       the bank and owned 35 properties located around the state
       of Virginia.  They were convicted at trial after denying
       any wrongdoing.  Mrs. Underwood was sentenced to 3 years.

Patrick Davison      Montana        $6.8 Million        10 Years

        In an 8 year scheme, Mr. Davison diverted most of the lost

        money to his personal use, according to prosecutors.

Charles E. Hays      Minnesota      $22 Million     9 Years 9 Months

        At the time of his arrest, Mr. Hays had more than

        $1 million in the bank and had used investor money to

        purchase a $3 million 64-foot yacht, several cars, a house,

        a crane, tractors, gold coins and family vacations.

Richard Johnson      Michigan       $13.2 Million       8 Years

        Of the $13.2 million unaccounted for in Mr. Johnson's

        10+ year scheme, a significant portion of the actual loss

        was diverted to his personal use, according to US Attorney

        Barbara McQuade.

John M. Donnelly     Virginia       $5.4 Million     7 Years, 6 Months

        Mr. Donnelly used the proceeds of his fraud to fund a

        luxurious lifestyle, buying an expensive home, a Hummer,

        64 acres of land and numerous motorcycles.

John Montana         New York       $33 Million         6 Years

        In a two year, international fraud scheme, Mr. Montana and

        three associates caused an actual loss of at least $13.6

        million.  Co-defendants were sentenced to 14 and 20 years.

Salvatore Favata     California      $30 Million         5 Years

        Mr. Favata lived an extravagant lifestyle with gambling

debts in excess of $10 million, leased luxury vehicles, and hosted lavish house parties and community music festivals.  His plea agreement was for a 5 year sentence.

Strikingly, of the 26 cases mentioned above, only one compares with Mr. Heckscher's situation in that the vast majority of the money obtained in the scheme went to pay interest and repay principal, rather than being diverted to enhance the personal life of the defendant (that being Wesley A. Snyder, whose fraud involved $29 million and who was sentenced to 12 years and 2 months).

Nearly every one of the defendants discussed above used significant amounts of their ill-gotten gains to lead extravagant lifestyles;  buy expensive homes, cars and jewelry;  or travel extensively.

Not one of these defendants was as forthcoming about his offenses as Mr. Heckscher, who voluntarily surrendered, turned over all of his records and gave a full, complete and truthful statement about the nature and extent of his fraudulent activities, then promptly agreed to enter into a plea agreement rather than forcing the case to trial.

By way of comparison: Harkless fled to Mexico for five years; Bunchan solicited the murder of witnesses and discussed killing the AUSA who was prosecuting him; Payne planned to buy a Caribbean island;  Judah obstructed and impeded the administration of justice; Heshelman was arrested in Switzerland;  Miller solicited a fake passport to another country;  Dao violated a consent decree to stop selling unregistered securities;  and Underwood denied wrongdoing and went to trial.

Of the cases closest to Mr. Heckscher's in total loss (those ranging between $30 and $80 million):

Harkless stole $39 million in just 4 years, diverted millions to foreign bank accounts and fled to Mexico for 5 years before being captured and brought to trial.

Bunchan stole $30 million, solicited the murders of 12 witnesses against him and discussed killing both the prosecutor handling his case and the families of the witnesses.

Judah stole $60 million in just 4 years, violated a specific court injunction in carrying out his scheme, and obstructed and impeded the administration of justice.

Treadwell stole $50 million and converted a significant portion of that money to support a self-indulgent lifestyle.

Retana stole $62 million from 2300 people in just 4 years.  When arrested, he had $800,000 in cash in his desk, $3.2 million hidden in his bookstore, and $8 million in several bank accounts.

Forte stole $80 million in 13 years and diverted between $12 and $28 million to his personal use.  His sentence was 15 years.

Midkiff stole $30 million and was convicted at trial of eight counts each of mail and wire fraud, plus other offenses, and received a 15 year downward departure sentence (from a possible life sentence).

Montana and his accomplices stole $33 million in just two years and he received a 6 year sentence.

Favata stole $30 million in just 5 years, lived an extravagant lifestyle and agreed to a plea bargain sentence of 5 years.

Of the cases for which defendants were sentenced (or in the case of Rothstein could be sentenced) to more than the 20 year maximum to which Mr. Heckscher could be sentenced, most involved thefts of significantly more money than is involved here (Madoff $18 billion, Petters $3.65 billion, Rothstein $1.2 billion, Payne $448 million, Judah $60 million and Retana $62 million); involved particularly egregious conduct (Harkless fled to Mexico for 5 years, Bunchan solicited the murder of witnesses, and Judah violated a judicial injunction and obstructed justice); and/or used significant amounts of the money for high living (all of the above plus Treadwell & Hsu, who also used the money to pervert the national political process).

Two cases for which defendants were sentenced to less than the 20 year maximum to which Mr. Heckscher could be sentenced involved thefts of considerably more than the loss here (Puff, $120 million and 18 years;  Forte, $80 Million and 15 years).

Of the remaining cases for which defendants were sentenced to more than 10 years, with just one exception, each of the defendants is considerably more culpable than Mr. Heckscher (Pimstein, $25 million, 17 years and a significant loss still unaccounted for; Heshelman, $7 million, 17 years and had to be arrested in Switzerland;  Healy, $16.7 million, 15 years 8 months and spent $10 million on himself in just one year;  Miller, $21 million, 13 years and attempted to obtain a fake passport to flee the country;  and Dao, $7 million, 12 years and continued her fraud in violation of a consent decree to stop selling unregistered securities).

The sole exception is the case of Wesley A. Snyder, who received 12 years and 2 months for theft of $29 million, most of which was returned to investors as interest or return of principal.

# V

## VICTIMS

Notwithstanding the foregoing discussion, there can be no gainsaying the harm done to the victims in this case by Mr. Heckscher.  Some of them have suffered the loss of their entire life's savings.  Some have physical or medical problems, the cost of treatment of which was being paid out of the interest payments from their "investments" with Mr. Heckscher.  Some suffered seven figure losses which, no matter their financial circumstances otherwise, constituted significant, heart-breaking losses.

Many of the victims were accounting clients and/or personal friends, some were family (including both Mr. Heckscher's sister and his now ex-wife).  All are feeling a sense of betrayal, violation of trust, pain and anger.  All of which feelings are certainly valid and completely understandable under the circumstances.

There is nothing Mr. Heckscher can say that will assuage the pain and anger, the sense of violation and betrayal.

Nevertheless, he intends to address the victims during his sentencing hearing.  He will acknowledge having abused their trust and will accept responsibility for his actions.  He will express his sorrow and regret for what he did and will apologize for the pain he has caused.

The stark and discouraging reality is that, barring something akin to a miracle, Mr. Heckscher will never be able to make whole all of those who suffered losses as a result of his actions.  He will, however, pledge to make whatever efforts he can, whenever he is released from custody, to maximize recompense to the victims.

# VI

## RESTITUTION

As noticed by the US Attorney's Office pursuant to 18 U.S.C. section 3664(d)(5), a complete compilation of the losses in this case have not yet been ascertained.

Mr. Heckscher therefore joins in the request by the United States that the court set a date for final determination of restitution for all victims, not to exceed 90 days after sentencing, to allow for the continued receipt of loss claims and calculation of an appropriate restitution schedule.

Mr. Heckscher also joins in the recommendation by the United States that the court appoint a special master empowered to make findings of fact and recommendations as to disposition of restitution, pursuant to 18 U.S.C. 3664(d)(6), and specifically to recommend a restitution schedule appropriate for each victim, pursuant to 18 U.S.C. 3664(i).

Information previously provided directly to counsel by various victims makes it clear that the individual economic circumstances of some victims mean that they have suffered disproportionately serious hardships and that these hardships should be accounted for in determining an appropriate restitution schedule.

Mr. Heckscher does have three significant assets which can be applied toward restitution either immediately or in the relatively near future.  From the inception of Mr. Heckscher's cooperation in this matter, he agreed to conserve those assets for the purpose of making at least a start on the payment of restitution.  These assets are his family home (jointly owned as community property by Mr.

Heckscher and his now ex-wife), a second residential income property
(also jointly owned by Mr. & Mrs. Heckscher as community property)
and a third home which is held in a trust in which Mr. Heckscher has
a one-fifth interest (the remaining 4/5's being held by other members
of his family -- his sister, brother, son and daughter, one-fifth
each).

As agreed between Mr. Heckscher and the U.S. Attorney's office,
the net proceeds of the sale of any of these properties, if sold
prior to sentencing, were to be held by counsel in a client trust
account.  It was further agreed that the net proceeds would include
both Mr. and Mrs. Heckscher's community property interests in the
primary and income residences.  With respect to the trust property,
Mr. Heckscher is the sole-owner of his 1/5 share and that share is
also to be paid over in full for the purpose of being applied toward
restitution.

Mr. Heckscher's primary residence has in fact been sold and the
net proceeds of slightly more than $360,000 are being held in a
Summit Defense CTA.  (Although Cynthia Heckscher was herself a victim
of her husband's fraud, in excess of $200,000 from a separate
property inheritance and/or community property but otherwise
separately held income, the entire net proceeds of the sale of the
home was paid over directly out of escrow into the Summit CTA.  As
agreed, Cynthia Heckscher derived no benefit from the sale of the
home.)

The residential income property is currently on the market for
sale.  The trust property is occupied by a long-term tenant and will
be placed on the market when that tenant's lease expires.

## VII

### CHARACTER LETTERS

A substantial number of character letters supporting Mr. Heckscher have been received by counsel and provided to U.S. Probation Officer Charlie Mabie, with copies provided to the Assistant U.S. Attorney Timothy Lucey.  Copies of all such letters are also attached as Exhibit B to this memorandum.

The court's attention is respectfully invited, in particular, to the letters from Mr. Heckscher's brother Ed, his son Jason and his daughter Jenni, as well as those from:

```
            Scott D. Colwell, Chief Marketing Officer,
                    Bruegger's Enterprises
        *  Dara Dejbakhsh, President & CEO, Danabo Group Inc.
                    (former Vice President, Baskin Robbins)
            Stewart Duboff
        *  Dennis H. Gramm (formerly of Baskin Robbins/Dunkin Brands)
        *  Kevin D. Grauman (business executive)
       **  James G. Merret, Jr. (Baskins Robbins franchisee)
            Kevin O'Mara (Togo's franchisee)
```

*  Individuals willing to employ Mr. Heckscher upon his release from custody.

**  Individual willing the help Mr. Heckscher find employment upon his release from custody.


Date:  May 10, 2010          Respectfully submitted,



                            _/s/ James T. Reilly_____

                            **JAMES T. REILLY, Attorney at Law**
                            **California State Bar No. 67254**
                            **Counsel for Defendant ROBERTO HECKSCHER**



**Summit Heckscher Defendant's Sentencing Memorandum 100510**

Re:   The United States of America v. Roberto Heckscher
        US District Court, Northern District of California, SF Division

### PROOF OF SERVICE

I, **JAMES T. REILLY,** hereby certify that I am an active member of the State Bar of California and not a party to this action.

My business address is:

        JAMES T. REILLY, Attorney at Law
        SUMMIT DEFENSE
        102 Washington Avenue, Point Richmond, CA 94801

I served copies of the indicated document as follows:

Date of Delivery:  May 10, 2010

Delivered by email addressed to:

        Assistant US Attorney Timothy J. Lucey
        United States Attorney's Office
        At his email address:  Timothy.Lucey@usdoj.gov

        US Probation Officer Specialist Charlie Mabie
        At his email address:  Charlie_Mabie@canp.uscourts.gov

Document Delivered:

        DEFENDANT'S SENTENCING MEMORANDUM

I declare under penalty of perjury that the foregoing is true and correct and that this declaration is executed on May 10, 2010, at Novato, California.

                        /s/ James T. Reilly
    _____

                **JAMES T. REILLY, Attorney at Law**
                **California State Bar No. 67254**
                **Counsel for Defendant Roberto Heckscher**