1   JOSEPH P. RUSSONIELLO (CSBN 44332)
United States Attorney
2
BRIAN J. STRETCH (CSBN 163273)
3   Chief, Criminal Division

4   TIMOTHY J. LUCEY (CSBN 172332)
Assistant United States Attorney
5
450 Golden Gate Avenue, Box 36055
6   San Francisco, California 94102
Telephone: (415) 436-7152
7   Facsimile: (415) 436-7234
E-mail: Timothy.Lucey@usdoj.gov
8
Attorneys for the United States of America
9

10          UNITED STATES DISTRICT COURT

11          NORTHERN DISTRICT OF CALIFORNIA

12              SAN FRANCISCO DIVISION

13   UNITED STATES OF AMERICA,          )     No.    CR 09 - 0998 SI
                                        )
14          Plaintiff,                  )     **UNITED STATES'**
                                        )     **SENTENCING MEMORANDUM**
15          v.                          )
                                        )     Date:   May 14, 2010
16   ROBERTO HECKSCHER,                 )     Time:   11:00 a.m.
                                        )     Judge:  Hon. Susan Illston
17          Defendant.                  )
     _____)

18

19

20

21

22

23

24

25

26

27

28

**SENTENCING MEMORANDUM**
**[CR 09 - 0998 SI]**

## TABLE OF CONTENTS

Page No.

I. INTRODUCTION .................................................................. 1

II.    BACKGROUND ................................................................ 2

A. Relevant Facts ............................................................... 2

   1.    The Promise to Investors .................................................. 2

   2.    The Betrayal of Investors ............................................... 3

   3.    The End of the Fraud  .................................................... 4

   4.    Summary of Victim Loss and Restitution ................................. 5

B. Procedural History  .......................................................... 5

III. DISCUSSION .................................................................... 6

A. Applicable Law .............................................................. 6

B. Guidelines Calculations ...................................................... 8

   1.    Calculations in the Presentence Report ................................. 8

   2.    Additional 2 Point Enhancement Appropriate ............................ 8

C. Application of 18 U.S.C. § 3553(a) ........................................... 11

   1.    Nature and Circumstances of the Offense ............................... 11

   2.    History and Characteristics of the Defendant .......................... 13

   3.    The Need to Afford Adequate Deterrence ................................ 14

   4.    The Need to Avoid Unwarranted Sentencing Disparities .................. 14

   5.    The Need to Provide Restitution ....................................... 16

   6.    Mitigating Factors .................................................... 18

IV. CONCLUSION .................................................................... 18

# TABLE OF AUTHORITIES

Page No.

FEDERAL CASES

*Gall v. United States*, 128 S.Ct. 586, 596 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*United States v. Booker*, 125 S.Ct 738, 760 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*United States v. Carty*, 520 F.3d 984, 992 (9th Cir.2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*United States v. Ciccone*, 219 F.3d 1078, 1087 (9th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . 9

*United States v. Okike*, 60 Fed.Appx. 100, 103 (9th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . 9

*United States v. Randall*, 162 F.3d 557, 560 (9th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Walton v. Arizona*, 497 U.S. 639, 653 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

FEDERAL STATUTES

18 U.S.C. § 1341 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 10

18 U.S.C. § 3553(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 8

18 U.S.C. § 3664(d)(5) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 16, 19

18 U.S.C. § 3664(d)(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

18 U.S.C. § 3664(i) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

18 USCA § 3553(a)121 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

SENTENCING GUIDELINES

U.S.S.G. § 3A1.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

U.S.S.G. § 3A1.1(b)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

U.S.S.G. § 3A1.1(b)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8-10

U.S.S.G. § 5G1.1(c)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

1   JOSEPH P. RUSSONIELLO (CSBN 44332)
    United States Attorney

2

3   BRIAN J. STRETCH (CSBN 163273)
    Chief, Criminal Division

4   TIMOTHY J. LUCEY (CSBN 172332)
    Assistant United States Attorney

5

6     450 Golden Gate Avenue, Box 36055
    San Francisco, California 94102
    Telephone: (415) 436-7152

7     Facsimile: (415) 436-7234
    E-mail: Timothy.Lucey@usdoj.gov

8

    Attorneys for the United States of America

9

10                UNITED STATES DISTRICT COURT

11             NORTHERN DISTRICT OF CALIFORNIA

12                 SAN FRANCISCO DIVISION

| | | |
|---|---|---|
| 13   UNITED STATES OF AMERICA, | ) | No.   **CR 09 - 0998 SI** |
| 14         Plaintiff, | ) ) | **UNITED STATES'** |
| | ) | **SENTENCING MEMORANDUM** |
| 15           v. | ) ) | Date:  May 14, 2010 |
| 16   ROBERTO HECKSCHER, | ) | Time:  11:00 a.m. |
| | ) | Judge:  Hon. Susan Illston |
| 17         Defendant. | ) | |
| 18 | ) | |

19                       **I. INTRODUCTION**

20       The United States respectfully submits this memorandum in connection with the

21   forthcoming sentencing of ROBERTO HECKSCHER ("Heckscher"), now scheduled for Friday,

22   May 14, 2010, at 11:00 a.m.

23       Defendant's criminal conduct was extraordinary. Beginning in 1979, Heckscher

24   proceeded to engage in systematic fraud of his family, friends, neighbors, and business partners

25   that continued unabated for thirty years. Heckscher concocted an elaborate scam based on the

26   purported use of short term promissory notes. He did so in large part to fuel a secret, second,

27   sorted life of gambling in the casinos of Las Vegas, Lake Tahoe, and Atlantic City.

28       For three decades, Heckscher solicited millions of dollars from investors under false

    **SENTENCING MEMORANDUM**
    **[CR 09 - 0998 SI]**

1   pretenses, failed to invest such funds as promised, and then converted those funds for his own
2   benefit, and the benefit of others. This criminal conduct has caused millions of dollars of losses
3   to investors, irrevocably altered the lives of generations of families, and driven many of his
4   victims to the brink of financial ruin, emotional distress, and physical illness.

5       The scope, duration, and nature of Heckscher's crimes warrant the maximum punishment
6   allowed by law, for which the Guidelines recommend a sentence of twenty years of
7   imprisonment. Comparisons with other large-scale frauds in this District only serve to
8   demonstrate the gravity of Heckscher's criminal conduct. The United States therefore
9   respectfully recommends that a reasonable sentence in this case would be maximum allowable
10  Guidelines sentence of twenty years, a term that will ensure both appropriate punishment of the
11  defendant and promote general deterrence in the future.

12                         **II. BACKGROUND**

13     **A.**     **Relevant Facts**

14       Defendant Heckscher ran a multi-million dollar Ponzi scheme that has left hundreds of
15  investors and their families financially, emotionally, and physically devastated. Heckscher's
16  scheme began in the late 1970's and continued without pause until only a few months before he
17  confessed to federal agents last year.

18                   **1.**     **The Promise to Investors**

19       In the late 1960s, Heckscher took over the tax preparation and bookkeeping business
20  known as Irving Bookkeeping and Taxes. Heckscher provided important tax preparation and
21  basic accounting to small businesses and individuals living and working in the Sunset District of
22  San Francisco.

23       Beginning in the late 1970's, Heckscher began to approach those clients with what
24  seemed like a reasonable proposition. Heckscher invited clients to invest their tax refunds and
25  profits from their businesses into a lending business. Heckscher promised his investors that he
26  would use their funds to arrange short-term loans to small businesses who needed short-term
27  operating capital. Heckscher told investors that these unidentified businesses (whose identities
28  Heckscher never disclosed, even when pressured) could not or did not want to borrow money

SENTENCING MEMORANDUM
[CR 09 - 0998 SI]          2

1   from banks and other traditional lender. Heckscher told his investors that these businesses were

2   reliable and were willing to pay slightly above the current market rate.

3   Heckscher explained that he could use his access to commercial lines of credit to act as a

4   middle man for the transaction and funnel their funds to the small businesses.[1] Heckscher

5   explained that his access to commercial credit allowed him to create a spread between the small

6   business owner (the borrower) and the investor (the lender) that netted a return slightly higher

7   than banks could offer on a comparable short-term Certificate of Deposit. This comparison made

8   the investment particularly attractive to the investors, as it not only gave them a ready touchstone

9   for comparison but also seemed to offer only slightly better than average return.

10  Once Heckscher obtained their funds, Heckscher typically contacted each investor at the

11  end of the short term loan. He would offer to roll the investment over to another, similar short

12  term note, to another, undisclosed small business owner or business. This process continued for

13  some investors for years, in some cases decades. Often, Heckscher would invite the investors to

14  invest more money with him and many of them. Some investors ultimately invested hundreds of

15  thousands of dollars. A few even invested millions.

16  As the fraud became more codified, Heckscher began generating year-end statements to

17  his clients. In what amounted to his annual report, Heckscher would advise investors of the

18  amount of their principal investment, the return based on short term interest rate for the year, and

19  advise them of the "rate" for the upcoming year. If applicable, Heckscher would also include a

20  check made payable to the investor, representing the "interest" generated on the year's loans.

21  While the particular interest rate varied, Heckscher generally promised his investors an

22  annual return of between roughly 7 to 13% return on their principal. Many investors received

23  hundreds, and some thousands of dollars in interest payments over the life of the fraud. None of

24  it was legitimate.

25              2.      **The Betrayal of Investors**

26

27  [1] Heckscher did in fact own and operate a series of Baskin-Robbins franchises as a sideline to his legitimate bookkeeping and tax preparing business. Heckscher apparently used that fact to spin his tale to investors about

28  leveraging his commercial credit line into promissory notes to other small businesses. While there may have been some legitimate lending in the early years of the scam, defendant's bank records and his own confession show little evidence of legitimate lending at anytime in the last 10 to 15 years, if not longer.

SENTENCING MEMORANDUM

[CR 09 - 0998 SI]                                3

1    In reality, Heckscher operated a Ponzi scheme for thirty years that paid out yearly
2  "profits" to existing investors from the monies he continued to collect from an ever-widening
3  circle of new investors. While Heckscher used some of the funds to make "interest" payments to
4  his investors on the fictitious "loans" he had described, he used the remainder for his personal
5  use, including regular gambling trips to Las Vegas, Lake Tahoe, and Atlantic City.

6    Based on the FBI's investigation as well as the findings in the Probation Department's
7  Presentence Report, the United States believes that Heckscher, whether by passage of time, loss
8  of memory, or intentional deception, has vastly understated the amount and scale of his gambling
9  habit and use of investor funds. The defendant himself admitted to the FBI and in his plea
10  agreement with the Court that he used investor money to gamble. The Probation Officer has
11  found evidence that defendant Heckscher established lines of credit at casinos as far as 1988. *See*
12  PSR, ¶58. Moreover, the PSR also documents that the defendant has left a trail of bad checks,
13  civil judgments, and an at least one outstanding criminal warrant strewn across the state of
14  Nevada.

15    Yet, perhaps most tellingly, counsel for the United States has heard both directly from
16  victims in impact reports, over the telephone, and from the Probation Officer of story after story
17  after of victims encountering Heckscher at gaming tables in Lake Tahoe and Las Vegas. Of
18  meeting the defendant, only to have Heckscher tell them he was in town on franchise business for
19  Baskin-Robbins. One victim, Dan Irving, (identified in ¶44, PSR) has advised the Probation
20  Officer and counsel that he accompanied Heckscher on regular gambling trips to Las Vegas in
21  the 1980s. On at least one occasion, Mr. Irving recalls that Heckscher arranged for the two of
22  them to fly to Las Vegas on a private jet. Upon arriving at the airport, Mr. Irving states that two
23  men were met by (literally) a legion of Roman guards from Caesar's Palace Hotel and Casino,
24  led by costumed hotel staff portraying Caesar and Cleopatra – with accompanying trumpet
25  fanfare. Whether Heckscher paid for such a greeting himself – or paid for by a hotel anxious to
26  fete a regular big gambler – Heckscher, by all accounts, relished the attention.

27    **3.    The End of the Fraud**

28    When the financial crisis rolled across the nation in 2008, Heckscher had already known

SENTENCING MEMORANDUM
[CR  09 - 0998 SI]                                    4

1  for at least 5 years that his fraud was millions of dollars in the hole with no prospect of full

2  repayment. Nevertheless, Heckscher continued to solicit new funds from new investors in order

3  to reimburse prior investors, stave off lawsuits, and avoid detection by law enforcement.

4  Ultimately, when faced with no way out, Heckscher attempted to commit suicide rather

5  than turn himself in the authorities. Only after his family had contacted police did Heckscher

6  finally muster the self-respect to confess his conduct to the Government and cooperate with the

7  investigation and face this Court.

8  ### 4. Summary of Victim Loss and Restitution

9  By October 2009, Heckscher had caused losses to approximately 292 victim groups,[2] who

10  had collectively suffered a loss of approximately $53,878,508. After subtracting out interest

11  payments and prior repayments of principal, the United States estimates that victims are owed

12  approximately $34,488,551 in restitution, based on the information received from victims and the

13  records of the defendant.

14  However, the United States advises the Court that the FBI made these estimates as of

15  approximately March 31, 2010. Counsel and the Probation Department has continued to receive

16  information from victims, up to and including May 7, 2010. The United States has also been

17  advised that many victims are in the process of completing and mailing or delivering their impact

18  reports to the Court and counsel. As such, the total amount of restitution and loss may still

19  increase. However, the United States is confident that the total loss for this conduct will not

20  exceed $100 million, such that any revision will not effect the calculation of loss under Section

21  2B1.1 of the Guidelines.

22  ### B. Procedural History

23  On Friday, October 30, 2010, defendant was arraigned on a one count information before

24

25      [2] The United States intentionally uses the term "group" to indicate each distinct record of investment with Heckscher. In many cases, couples and families pooled their monies to make a single, lump sum contribution with Heckscher. In other cases, parents made an initial investment with Heckscher, and their children, when they grow older, added to that principal under their parents' name and account. In addition, many of the victims have advised the United States that they made their investments on behalf of their children or grandchildren (i.e., for the benefit of their heirs and assigns) and thought of that money/investment as really belonging to their children and grandchildren. As a result, if all of those individual investors and intended beneficiaries were identified singularly, the number of victims would be well over 500, and potentially as high as 1,000 persons or more.

SENTENCING MEMORANDUM

[CR 09 - 0998 SI]                                              5

1   the Honorable Elizabeth D. Laporte.  At that time, the defendant waived a formal detention

2   hearing and was remanded to the custody of the United States Marshal.  The defendant has been

3   in continuous federal custody since that time.

4        Later on October 30, 2010, the defendant appeared before this Court and pled guilty

5   pursuant to a plea agreement to the single count of the information, 18 U.S.C. § 1341, mail fraud.

6   The defendant's sentencing was scheduled for Friday, May 14, 2010.

7        On May 4, 2010, the United States filed a notice pursuant to 18 U.S.C. § 3664(d)(5),

8   advising the Court that the number and losses suffered by all victims were not ascertainable and

9   recommending that the Court set the determination of the amount of restitution and distribution

10  to victims for a hearing no later than ninety (90) days after sentencing.

11                          **III. DISCUSSION**

12      **A.    Applicable Law**

13       The advisory Sentencing Guidelines promote the "basic aim of Congress in enacting the

14  Sentencing Reform Act, namely "ensuring similar sentences for those who have committed

15  similar crimes in similar ways."  *United States v. Booker*, 125 S.Ct 738, 760 (2005).  In

16  furtherance of that goal, a sentencing court is required to "consider the Guidelines 'sentencing

17  range established for applicable category of offense committed by the applicable category of

18  defendant,' the pertinent Sentencing Commissions policy statements, the need to avoid

19  unwarranted sentencing disparities, and the need to provide restitution to victims."  Id. at 764

20  (citations omitted).

21       Along with the Guidelines, the other factors set forth in Section 3553(a) must be

22  considered.  Section 3553(a) directs the Court to impose a sentence sufficient, but not greater

23  than necessary" to comply with the purposes set forth in paragraph two.  That sub-paragraph sets

24  forth the purposes as:

25             (A) to reflect the seriousness of the offense, to promote respect for the law,

26                  to provide just punishment for the offense;

27             (B) to afford adequate deterrence to criminal conduct;

28             (C) to protect the public from further crimes of the defendant; and,

SENTENCING MEMORANDUM
[CR  09 - 0998 SI]                    6

1        (D) to provide the defendant with needed educational or vocational training

2        medical care, or other correctional treatment in the most effective manner.

3    Section 3353(a) further directs the Court – in determining the particular sentence to impose – to

4    consider: (1) the nature and seriousness of the offense and the history and characteristics of the

5    defendant; (2) the statutory purposes noted above; (3) the kinds of sentences available; (4) the

6    kinds of sentences and the sentencing range as set forth in the Sentencing Guidelines; (5) the

7    Sentencing Guidelines policy statements; (6) the need to avoid unwarranted sentencing

8    disparities; and, (7) the need to provide restitution to any victims of the offense. *See* 18 U.S.C. §

9    3553(a).

10        In the post-*Booker* era, district courts making sentencing decisions must make the

11   Guidelines "the starting point and the initial benchmark" for their decisions. *Gall v. United*

12   *States*, 128 S.Ct. 586, 596 (2007); *United States v. Carty*, 520 F.3d 984, 992 (9th Cir.2008)

13   (quoting *Gall* ). While district courts are not required to impose a sentence within the

14   Guidelines, they must "give serious consideration to the extent of any departure from the

15   Guidelines," and they must then "explain [the] conclusion that an unusually lenient or an

16   unusually harsh sentence is appropriate in a particular case with sufficient justifications." Carty,

17   520 F.3d at 992 (quoting Gall, 128 S.Ct. at 594).

18        "While the Guidelines are to be respectfully considered, they are one factor among the

19   § 3553(a) factors that are to be taken into account in arriving at an appropriate sentence." *Carty*,

20   520 F.3d at 991 (citing *Kimbrough v. United States*, 128 S.Ct. 558, 570 (2007)). "[T]he

21   Guidelines factor [may not] be given more or less weight than any other." *Id.* So while the

22   Guidelines are the "starting point and initial benchmark" and must "be kept in mind throughout

23   the[sentencing] process," *id.*, the Guidelines range constitutes only a touch-stone in the district

24   court's sentencing considerations. *See id.* Thus, in sum, the district court must consider both the

25   seven § 3553(a) factors and the Guidelines when imposing sentence.

26        In arriving at a sentence, a district court need not expressly state how each of the §

27   3553(a) factors influenced its decision: "[t]he district court need not tick off each of the §

28   3553(a) factors to show that it has considered them." *Carty*, 520 F.3d at 992. Instead, the Ninth

SENTENCING MEMORANDUM
[CR 09 - 0998 SI]                        7

1 Circuit "assume[s] that district judges know the law and understand their obligation to consider

2 all of the § 3553(a) factors, not just the Guidelines." *Id.* (citing *Walton v. Arizona*, 497 U.S. 639,

3 653 (1990)).

**B.   Guidelines Calculations**

    **1.   Calculations in the Presentence Report**

6     The United States agrees with all but one of the Probation Officer's Guidelines

7 calculations, which are set forth in the final Presentence Report as follows:

| | | | |
|---|---|---|---|
| a. | Base Offense Level<br>(U.S.S.G. § 2B1.1(a)): | | 7 |
| b. | Specific Offense Characteristic<br>Loss in Excess of $50 Million<br>(U.S.S.G. § 2B1.1(b)(1)(M): | | +24 |
| c. | Specific Offense Characteristic<br>More than 250 Victims<br>(U.S.S.G. § 2B1.1(b)(2)(C): | | +6 |
| d. | Victim-Related Adjustment<br>Vulnerable Victims<br>(U.S.S.G. § 3A1.1(b)(1): | | +2 |
| e. | Role in the Offense<br>Abuse of Trust<br>(U.S.S.G. § 3B1.3): | | +2 |
| f. | Acceptance of Responsibility<br>(U.S.S.G. § 3E1.1): | | -3 |

19     **Adjusted Offense Level:**     **38**

20     **Criminal History**     **I**

21     **Guidelines Range:**     **235 - 292 months**

    **2.   Additional 2 Point Enhancement Appropriate**

23     The United States submits that a further 2 point enhancement should apply under the

24 victim-related adjustment because there are "large number of vulnerable victims." U.S.S.G. §

25 3A1.1 (b)(1)(2).   The Ninth Circuit has held that a four level increase for multiple vulnerable

26 victims should apply where a defendant knows "or had reason to know that there were a large

27 number of victims who were vulnerable because of their age or because they had been previously

28 victimized or "reloaded." *United States v. Okike*, 60 Fed.Appx. 100, 103 (9th Cir. 2003).

1    As detailed in the spreadsheet submitted to the Court under separate cover, the United
2    States estimates that at least 84 victims are "vulnerable" by virtue of their advanced age, physical
3    health, or mental condition. In the Government's view, without even considering the issue of
4    multiple investments, this number of vulnerable victims warrants the additional two point
5    enhancement under U.S.S.G. § 3A1.1(b)(2). If the Court remains uncertain, however, the
6    decision in *Okike* demonstrates that 2 more points should be applied to this defendant's conduct.

7    In *Okike*, the Ninth Circuit analyzed and affirmed the application of the four point
8    enhancement for vulnerable victims in a long-running mail fraud in which the defendant solicited
9    funds from the victims multiple times. The appellate court found "there was clear and
10   convincing evidence in the record that the defendant knew or had reason to know that a large
11   number of the victims were vulnerable because they had been previously victimized, often by
12   defendant's own companies." *Id.* (citing *United States v. Ciccone*, 219 F.3d 1078, 1087 (9th Cir.
13   2000) (affirming vulnerable victim adjustment where the victims were "repeatedly targeted for
14   further fraudulent solicitations"); *United States v. Randall*, 162 F.3d 557, 560 (9th Cir. 1998)
15   (affirming adjustment where victims were "reloaded").

16   The defendant's PSR in *Okike* stated that 1,411 victims transferred money to the subject
17   account and that 527 of those people had been victimized more than once. The extensive
18   reloading practice was established by the Government's supplemental sentencing exhibits, which
19   included: forms used by defendant's telemarketers in which they asked potential victims
20   questions about their prior telephone gambling experiences; payroll sheets indicating that the
21   defendant re-victimized several customers; and a letter from one victim who described the
22   multiple times the defendant and others called her and the many payments she made. *Id.*

23   Here, it is undisputed that Heckscher carried on his fraud for more than three decades,
24   repeatedly soliciting and "investing" multiple rounds of funds from many of his victims.
25   Heckscher's scheme was not a wide-ranging, universal scam involving cold-calling or spam
26   email. Heckscher did not advertise to the public. Heckscher instead engaged in an even more
27   insidious fraud, preying on people with whom he already had an established rapport.

28   Heckscher targeted those who were existing clients of his tax preparing business and who

SENTENCING MEMORANDUM
[CR 09 - 0998 SI]                        9

1   had already shared their most intimate financial details. He also targeted colleagues and friends
2   as well as "investors" who had learned of him by word of mouth from existing investors. In
3   short, he funded his fraud – and his gambling habit – by stealing money, for three decades, from
4   people who he knew had already lost thousands of dollars and could not afford to lose any more.

5          Even worse, numerous victims have reported in their Victim/Witness Impact Report and
6   in telephone calls to Government counsel that Heckscher solicited additional rounds of
7   "investments" as late as **the spring of 2009**. At that point, Heckscher already knew that the
8   fraud was collapsing all around his ears. He knew these additional monies would only go to pay
9   off other investors/victims who were demanding repayment of their principal. He knew these
10  additional monies would almost certainly be lost to the fraud. Most importantly, he knew that
11  many, if not, all of those final victims could not afford to lose those funds. And, yet, knowing all
12  of that, he went ahead and took their money.

13         The Government estimates, based on information currently available to it, that as many as
14  60%, if not more, of Heckscher's investor/victims made multiple investments over the thirty-plus
15  years of the scheme. Like the defendants in *Okike, Ciccone, and Randall,* Heckscher routinely
16  reloaded his gambling coffers by soliciting the same group of victims over, over, and over again,
17  knowing all the while his victims would be left with little or no money for retirement, medical
18  care, or their children's inheritance.

19         Therefore, based on the language of U.S.S.G. § 3A1.1(b)(2), Ninth Circuit precedent, and
20  the facts as applied here, the Government submits that the Court should apply the additional two
21  points under section 3A1.1(b)(2) and calculate a total adjusted offense level, after acceptance, of
22  40. At Criminal History I, defendant Heckscher's guideline range, before application of section
23  3553(a), would more appropriately be calculated at between 292 to 365 months.

24         Pursuant to U.S.S.G. § 5G1.1(c)(1), the sentence shall not be more than the statutorily
25  authorized maximum sentence of the offense of conviction. As 18 U.S.C. § 1341 provides for a
26  maximum sentence of twenty years, unless it affects a financial institution, defendant's resultant
27
28

SENTENCING MEMORANDUM
[CR  09 - 0998 SI]                          10

1   guideline sentence would be limited to a maximum of 240 months.[3]

2   **C.      Application of 18 U.S.C. § 3553(a)**

3   **1.      Nature and Circumstances of the Offense**

4   Heckscher's crimes were serious and long-running and devastating to victims and their

5   families and friends. Lives have been irretrievably altered, in some cases forever, by Heckscher's

6   blatant abuse of trust and wanton disregard for human decency. The sheer depth of Heckscher's

7   fraud calls for severe punishment. Victims have lost, in total, millions of dollars. Yet, the

8   monetary loss only begins to tell the true extent of the harm suffered by Heckscher's victims.

9   Unlike many of the victims in other investment schemes, who lost millions but had

10  millions more to fall back on, the victims here were by and large self-made, hard-working

11  residents of the Sunset District and other neighborhoods of San Francisco. Some had never

12  invested in anything more sophisticated than a bank savings account. Many were small-business

13  owners, tradesmen, hourly workers, and immigrants, people for whom nothing had ever been

14  handed or inherited from some family trust. These were people for whom every dollar they

15  earned was precious, for themselves, their spouses, and their children and grandchildren.

16  As the Court is aware, the Victim Impact Statements record a heartbreaking record of

17  loss, anguish, and, in many cases, despair. The defendant stands responsible not only for wiping

18  out the financial resources of generations of families – the effects of which can never be fully

19  accounted – but also causing real emotional pain and even physical suffering among his victims,

20  as detailed below, anonymously:

21  •      "[I have lost] my life savings";

22  •      "The loss of income is impossible for me to explain at my age. The principal was

23          my security."

24

25  [3]The United States also notes that there are at least 45 to 50 victims that appear to have been made financial

26  insolvent as a result of the defendant's fraud. However, the United States and the FBI do not believe, based on the
    information currently provided by the victims, that over 100 victims have been made financially insolvent by

27  Heckscher. As a result, the Probation Department and the United States agreed that the additional two point
    enhancement under U.S.S.G. § 2B1.1(b)(14)(B)(iii). If the enhancement were to have applied, Heckscher's resultant

28  guideline range would have risen to an adjusted level of 42 with a resultant guideline range of 360 to life. However,
    given the number of victims who were made financially insolvent, the United States believes that a sentence at the
    high end of the guidelines, whether at 38 or 40, is appropriate, to the extent possible under the statute.
    SENTENCING MEMORANDUM
    [CR 09 - 0998 SI]                               11

1       •     "We cannot financially recover from this. . . . Life has changed completely."

2       •     "The monies . . . were the very last of the income I received from the sale of my

3              home of 43 years in 2004. . . I have no other savings.  I was forced to leave the

4              retirement community I lived in since 2005 . . .  I could no longer afford the rent."

5       •     "I lost my entire life savings due to this crime... I may never be able to recover this

6              amount of money."

7       •     "The loss of these funds has made my financial situation very difficult causing me

8              to borrow money from my brother-in-law . . . to pay my daily expenses . . . no

9              other source of income and live alone."

10      •     "Our lives have been devastated . . . robbed us of our retirement, forcing use into

11            financial hardship . . . on the verge of losing our home . . . no other income"

12      •     "[I am a] widow on fixed income with bad health . . . can't afford some of my

13            medication . . . have to resort to rationing"

14      •     "Devastating effect that is irreversible . . . invested all of our retirement funds

15            [with Heckscher] . . . I'm broke"

16      •     "Loss of our savings and retirement and income. . . . Worried how we will pay our

17            bills."

18          In addition, counsel for the United States had received phone calls from numerous

19 victims who have expressed not only outrage and anger at the defendant but also spoken of

20 suffering real, emotional and physical pain as a result of the crime.  The physical toll has

21 included high blood pressure, loss of appetite, hypertension, weight loss, weight gain, insomnia,

22 depression, paranoia, and anxiety.  Some have advised the United States that they are now

23 dealing with chronic illnesses and even cancer, which they cannot necessarily link to Heckscher

24 but which they feel as a link to the defendant on some level.   Emotionally, many victims have

25 recounted how this experience has left them feeling empty and broken.  Many doubt whether they

26 can ever trust anyone again.  Many say they do not foresee how they can ever hope to overcome

27 the anguish and pain of realizing that someone who they known for so many years – who had

28 visited them in their homes — had in fact been lying to the face for years.

SENTENCING MEMORANDUM
[CR  09 - 0998 SI]          12

1       This was the fraud of the highest order. Heckscher used his personal relationship to
2   devastate and utterly wreck the lives of hundreds of people and their family and friends. And he
3   caused all of this harm only to fritter it away on the gaming tables of Las Vegas, Lake Tahoe, and
4   Atlantic City. His conduct warrants the stiffest and most severe of punishments.

5                           2.      **History and Characteristics of the Defendant**

6       Heckscher repeatedly and callously lied to and violated the trust of his victim investors.
7   He demonstrated a lack of respect for the law and basic human decency.

8       The length of Heckscher's criminal conduct really does speak for itself. His crimes were
9   not a one-time event arising out of some kind of emergency or extenuating circumstance.
10  Instead, this was the product of a series of decisions, repeated over and over again, for more than
11  thirty years. It was within Heckscher's power to stop his crimes and try to repair the damage at
12  any point along the way.

13      Instead, Heckscher sent out annual "reports" to his investors, advising them of the state of
14  the principal and often sending along interest payments for the year's return. Heckscher
15  apparently disregarded – or was too busy gambling to care – that his investors
16  made real, important, life-changing decisions based on these false document and these bogus
17  "interest" payments: decisions about retirement, college education, home purchases, wills, trusts,
18  health care, travel, charitable gifts. All of these were made without knowing that their money
19  was in jeopardy, and in many cases, already long gone. Although he could have ended his
20  scheme decades ago, he chose not to do so. Instead, he waited until the summer of 2009, only
21  after he had run out of new investors, was hounded by creditors and investors, and had tried to
22  take his own life.

23      Heckscher did not undertake his scheme in response to economic hardship. He had every
24  chance to succeed in life through honest work. While he and siblings have suffered some abuse
25  at the hands of their father, it appears he otherwise had a reasonably normal childhood.
26  Ultimately, he was fortunate enough to apprentice under the Irving family and ultimately was
27  able to buy the bookkeeping business. He had, by all accounts, a loving wife and children. He
28  had a successful second line of work as the owner of Baskin-Robbins ice cream franchises. He

SENTENCING MEMORANDUM
[CR 09 - 0998 SI]                               13

1 appears to have a whole circle of clients, friends, and associates who cared about and enjoyed his

2 company. Yet, even with what many would regard as a full life, he undertook to concoct an

3 elaborate fraud that appears only served to fund a second, secret life as a high-rolling gambling in

4 Nevada and New Jersey.

### 3. The Need to Afford Adequate Deterrence

6 The United States submits that the imposition of the maximum sentence of twenty years

7 is necessary to afford adequate deterrence. This case has attracted the attention of the public in

8 San Francisco and the larger Bay Area, particularly for the size of the loss compared to the

9 background of many of the victims. The United States submits that all victims are equal before

10 this Court. The United States further submits that it is the nature of the harm and the effect of the

11 crime, and not the address or name of the victim, that informs the need for the appropriate

12 punishment.

13 That being said, the United States submits that the need for deterrence is more important

14 in this case, in many ways, than in cases involving stock, bonds, and other publicly traded

15 instruments. Unlike those situations, in which federal or state regulators may serve as the first

16 line of defense and detection, a scheme based on private contracts and purported short-term

17 promissory notes is not susceptible to regular oversight or administrative regulation.

18 Indeed, the need for deterrence is especially important at small businesses like

19 Heckscher's where individuals may operate a fraud under the misapprehension that they are

20 "flying under the radar screen" and may be able to avoid detection or, even if detected, long jail

21 terms. The United States respectfully submits that the Court should consider that for these types

22 of crimes, only a sentence at the statutory maximum may deter those who would prey upon small

23 investors and their families.

### 4. The Need to Avoid Unwarranted Sentencing Disparities

25 Any comparison between Heckscher's fraud and recent sentences in this District only

26 serves to demonstrate the level of harm and abuse resulting from this defendant's thirty year

27 scam of his family, friends, and neighbors. A review of some of the more significant is as

28 follows:

SENTENCING MEMORANDUM
[CR 09 - 0998 SI]                          14

1  •  In *United States v. McCall* (CR 00-0505 WHA), in March 2010, the District Court
2     imposed a sentence of 120 months on a corporate executive who committed
3     accounting fraud. In that case, the defendant's adjusted offense level was 32 and
4     his resultant range was 121 to 151 months. Notably, while the loss was calculated
5     to be over $80 million, the loss was spread over thousands of individual and
6     institutional investors who had suffered fractional losses in the value of the
7     company's stock price. No victims were identified as either vulnerable nor
8     financially insolvent. The court did not order any restitution to be paid but instead
9     ordered a fine of $1 million.

10  •  In *United States v. DelBaggio* (CR 09 - 296 CRB), the District Court imposed a
11     sentence of 97 months on the defendant who had created a loss of approximately
12     $60 million. The co-defendant in that action, Mr. Cacchione, was later sentenced
13     to 60 months in prison for his role in the offense. However, the victims in that
14     fraud were far fewer, highly sophisticated, and none were deemed either
15     vulnerable nor financially insolvent. Indeed, many of the victims in that action
16     were financial institutions with their own internal units of accountants and
17     lawyers. As a result, the adjusted offense level for both defendants was calculated
18     at a much lower level than that determined for Mr. Heckscher.

19  •  In *United States v. Trabulse* (09 - 0350 WHA), the District Court imposed a
20     sentence of 97 months on the defendant who had created a loss of approximately
21     $17 million. The Court also ordered restitution to be paid in the amount of $8.5
22     million. The number of victims in that action were less than 200 in number, and
23     the victims were highly sophisticated investors in a hedge fund. None of the
24     victims were identified as either vulnerable nor financially insolvent.

25  •  In *United States v. Camus* (CR 08 - 0231 MHP), the District Court imposed a
26     sentence of 63 months on the defendant who had created a loss of approximately
27     $1.9 million. The Court also ordered the defendant to pay restitution in the
28     amount of $1.4 million. The short-term investment scheme had far fewer victims

SENTENCING MEMORANDUM
[CR 09 - 0998 SI]                              15

1    than the present case and none of the victims were determined to have any special

2    characteristic.

3    •   In *United States v. Ehee* (CR 09 - 0105 WHA), the District Court imposed a

4        sentence of 51 months for the manager of an investment fraud who had created a

5        loss to his investors of $4 million. Again, the number of victims were far fewer

6        than exists in this matter, and the victims were not found to have any special

7        characteristics.

8    •   In *United States v. Carrington* (CR 09 - 0791 DLJ), the District Court imposed a

9        sentence of 48 months to the manager of an investment that created a loss of over

10       $4 million. The Court ordered restitution of $3 million to the 13 victims. Once

11       again, the number and nature of the victims, along with the size of the loss, is

12       demonstratively different from the present matter.

13   •   In *United States v. McVickar* (CR 09 - 0472 CBM), the District Court sentenced

14       the defendant who ran a short term investment scheme to 42 months in prison and

15       ordered restitution of nearly $500,000. That matter involved 10 victims, none of

16       whom were determined to be vulnerable.

17   None of these cases include the same combination of size, length, and number of victims

18   as this one now before the Court. While the above-referenced defendants engaged in wrongful

19   and some cases egregious conduct, Heckscher's conduct is unique in this District in its sheer

20   scope and duration. His fraud was perpetrated day-by-day, month-by-month, and year-by-year, at

21   his own direction and control, for a full thirty years. For it, he was able to fund his secret life of

22   gambling and avoid detection by family, friends, and law enforcement.

23              **5.     The Need to Provide Restitution**

24              The United States has advised the Court via notice on May 4, 2010, that the precise

25   number, amount, and form of restitution remained uncertain as to all victims. In particular, the

26   United States advised the Court that impact statements were still be receiving from victims, such

27   that it recommended that the Court extend the time for determination of restitution an additional

28   90 days from the date of sentencing. *See* 18 U.S.C. § 3664(d)(5).

SENTENCING MEMORANDUM
[CR 09 - 0998 SI]                          16

1   In addition, the United States again recommends, as it did in its May 4th filing, that the

2   due to the amount of restitution at issue, the number of potential victims, and the limited assets

3   currently known to the exist, the Court may see fit to appoint a special master, pursuant to 18

4   U.S.C. § 3664(d)(6). This special master would be empowered by the Court to make proposed

5   findings of facts and recommendations as to the disposition of restitution, and specifically, the

6   amount of restitution and payment schedule appropriate as to each victim of the defendant's

7   criminal conduct, pursuant to 18 U.S.C. § 3664(d)(6) and 18 U.S.C. § 3664(i).

8       In addition to verifying victim losses and the allocation of restitution among victims, the

9   special master may be able to advise the Court and the counsel as to the disposition of a life

10  insurance policy currently in effect for the defendant. The United States has recently been

11  advised by several victims that the Heckscher has a life insurance policy that remains in effect

12  that, while it has no present cash value, does have a potential payout to beneficiaries in excess of

13  a million dollars. The United States has further been advised by several victims – and this has

14  been confirmed by defense counsel – that Heckscher added some investors to his life insurance

15  policy over the years as a form of collateral to secure their investment into his scheme. The

16  United States has also learned from other victims that many investors were promised to be

17  similarly included on Heckscher's insurance, but they do not know if they were ever formally

18  added as beneficiaries.

19      The United States has further been advised that the insurance company (the identity of

20  which is not yet known) has contacted certain unidentified victims who are beneficiaries on the

21  policy and asked them if they wished to pay the premiums that were unpaid and still to be paid in

22  the future, in order to keep the policy in effect. The United States understands that these

23  investor/victims/beneficiaries have in fact taken action to pay Heckscher's premiums, such that

24  the life insurance policy remains in full force and effect.

25      As the Court will certainly agree, the existence and extent of such a life insurance policy,

26  even a term life policy with no present cash value, may be very relevant to the determination of

27  the order and allocation of restitution. As a result, the United States has contacted the FBI, the

28  Probation Department, and the defense counsel in an effort to gather documents and further

SENTENCING MEMORANDUM
[CR 09 - 0998 SI]                        17

1   information relative to this issue.

2   In summary, the United States is committed to the determination of and distribution of

3   restitution as soon as practicable. The United States will continue to follow up on all leads

4   regarding the location or identification of any assets that may be appropriate for judicial action.

5   The 90 day extension requested by the United States will neither hinder nor delay the United

6   States' efforts to maximize the recovery of victims.

7   ### 6.    Mitigating Factors

8   The United States fully recognizes that the defendant's actions since June 2009 merit

9   consideration. The defendant did finally come forward and confess his scheme to the FBI and

10   the United States Attorney's Office. He did make all of his business and personal financial

11   records available to the FBI. He did agree to waive his right to a grand jury and proceed by way

12   of information. He did agree to waive his right to a detention hearing and a bail hearing and

13   instead go directly into custody at his arraignment. The defendant did agree to plea guilty and

14   enter into a plea agreement in which he waived his right to jury trial and his right to appeal his

15   sentence. All of that is commendable and did save the Government valuable time and resources.

16   That being said, the United States agrees with the recommendation of the Probation

17   Department that no mitigating factor or factors exist so as to merit a sentence below the

18   applicable Guidelines range. Moreover, the defendant has, in effect, received a benefit by

19   coming forward, confessing, and pleading guilty to the sole count of the information. If the

20   defendant had chosen to proceed by way of indictment, the defendant could well have faced

21   multiple counts. If he had been tried and convicted or even pled guilty to multiple counts, the

22   defendant might well face a higher statutory maximum, one that would permit a sentence at his

23   likely Guidelines range of twenty-five to thirty years in custody. In other words, the defendant

24   has received a benefit by confessing, accepting responsibility, and pleading guilty to full course

25   of his criminal conduct.

26   ## IV. CONCLUSION

27   The United States asks the Court to sentence the defendant to 240 months of

28   imprisonment to be followed by three years of supervised release. The United States also

SENTENCING MEMORANDUM
[CR  09 - 0998 SI]                        18

1   recommends that the Court impose not only the conditions of supervised release suggested by the

2   Probation Department but also any other terms and conditions deemed appropriate by the Court.

3   In addition, the United States also requests that the Court impose a $100 special

4   assessment for the conviction on the single count.  The United States is not recommending a fine,

5   in order to conserve any and all defendant for the payment of restitution to Heckscher's victims.

6        Finally, the United States recommends that the Court continue the issue of restitution

7   until a date no later than 90 days after the date of defendant's sentencing, pursuant to 18 U.S.C. §

8   3664(d)(5).  The United States further recommends that, in conjunction with that continuance,

9   the Court also appoint a special master to make findings of fact and recommendations to this

10  Court and counsel as to amount of restitution as well as the order and distribution of payment of

11  restitution between and among the victims.  The United States recommends that a report from

12  such a special master be filed with the Court and counsel no later than three weeks prior to the

13  date set for a hearing on restitution, so as to provide sufficient time for counsel to review,

14  analyze, and comment upon the report in advance of the hearing on restitution.

15                                          Respectfully submitted,

16
                                            JOSEPH P. RUSSONIELLO
17                                          United States Attorney

18

19  Dated: May 12, 2010                     _____/S/_____
                                            TIMOTHY J. LUCEY
20                                          Assistant United States Attorney

21

22

23

24

25

26

27

28

**SENTENCING MEMORANDUM**
**[CR  09 - 0998 SI]**                          19